503 F.2d 1086
 8 Fair Empl.Prac.Cas. 897, 8 Empl. Prac. Dec. P 9727
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,
v.
MacMILLAN BLOEDEL CONTAINERS, INC., and Local 544, United
Paperworkers International Union, AFL-CIO,
Defendants-Appellees.
 No. 74-1191.
 United States Court of Appeals, Sixth Circuit.
 Argued June 4, 1974.
Decided Oct. 9, 1974.
 
 Mary Helen Mautner, E.E.O.C., Washington, D.C., for plaintiff-appellant; William A. Carey, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Beatrice Rosenberg, Charles L. Reischel, Attys., E.E.O.C., Washington, D.C., Richard Lieberman, Chicago Regional Litigation Center, Chicago, Ill., Howard Besser, E.E.O.C., Frederick M. Coleman, U.S. Atty., Cleveland, Ohio, on brief.
 Thomas H. Barnard, Cleveland, Ohio, Robert I. Doggett, Cincinnati, Ohio, for defendants-appellees; Lowell L. Garrett, G. Christopher Meyer, Squires, Sanders & Dempsey, Norton N. Newborn, Gaines & Stern Co., LPA, Cleveland, Ohio, on brief.
 Before PHILLIPS, Chief Judge, LIVELY, Circuit Judge, and GRAY, District Judge.*
 PHILLIPS, Chief Judge.
 
 
 1
 This action was brought by the Equal Employment Opportunity Commission (EEOC) against MacMillan Bloedel Containers, Inc. (MacMillan) for alleged race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000 et seq. Local 544, United Paperworkers International Union, AFL-CIO (the Union), was joined as a party-defendant under Rule 19(a), Fed.R.Civ.P., but was not charged with a Title VII violation. The District Court granted MacMillan's motion for summary judgment because it found that a condition precedent to suit, namely the filing of a charge with the EEOC, had not been fulfilled. The court, suasponte, entered summary judgment in favor of the Union because its position in the suit was derivative of MacMillan's. We reverse.
 
 
 2
 In 1969, a Mrs. Della Mercer filed charges of race and sex discrimination with the EEOC against the Flintkote Company, Hankins Container Division (Flintkote). The charges were directed at Flintkote's Cleveland, Ohio facility, located at 14801 Emery Avenue. The charges were investigated by the EEOC. On November 27, 1972, the EEOC notified Flintkote that it had reasonable cause to believe that Flintkote had engaged in unlawful employment practices. The EEOC invited the parties to join with it in a collective effort to resolve the matter. At some time, not apparent from the records, MacMillan took over operation of Flintkote's Cleveland facility. The nature of the transaction between Flintkote and MacMillan does not appear in the record.
 
 
 3
 On July 5, 1973, the EEOC filed suit against MacMillan who was then and is now operating the Cleveland facility. The complaint alleged, inter alia, that MacMillan maintained policies and practices which discriminated on the basis of sex and race. Additionally, paragraphs eight and nine of the complaint stated:
 
 
 4
 '8. More than thirty days prior to the institution of this action, a charge was filed with the Commission in which it was alleged that Defendant Corporation engaged in employment practices made unlawful by Title VII. '9. All conditions precedent to the institution of this action have been fulfilled.'
 
 
 5
 The Union, although named as a party-defendant, was not charged with a Title VII violation. Rather, it was joined under Rule 19(a), Fed.R.Civ.P., because the decree entered by the court might affect its collective bargaining agreement with MacMillan.
 
 
 6
 MacMillan moved in the alternative: 1) to dismiss under Rule 12, Fed.R.Civ.P., for failure to state a claim upon which relief could be granted and for lack of subject matter jurisdiction, 2) for a grant of summary judgment in its favor, or 3) to require a more definite statement of the allegations in paragraphs eight and nine of the complaint, supra. An affidavit of Douglas D. Thompson, the administrative officer of MacMillan, was submitted with these motions. The thrust of the motions and affidavit was that, prior to July 5, 1973, MacMillan had not been named in any charges alleging race and sex discrimination at its Cleveland facility.
 
 
 7
 Throughout the entire proceedings in the District Court, the EEOC relied solely upon its allegations in the complaint. At no time did it submit evidence in support of or amplify upon the allegations in paragraphs eight and nine of the complaint.
 
 
 8
 The District Court granted summary judgment in favor of MacMillan because no charges had been filed against MacMillan for its Cleveland facility prior to institution of the suit and, sua sponte, in favor of the Union because its position in the suit was derivative of MacMillan's.
 
 I.
 
 9
 The EEOC, while not denying that MacMillan was not charged, contends that MacMillan is, nevertheless, liable as a successor employer to remedy the discriminatory practices of Flintkote. This liability, it is alleged, rests upon the same considerations which govern liability as a successor employer under the National Labor Relations Act (Labor Act), 29 U.S.C. 151 et seq.
 
 
 10
 The issue has two aspects: 1) Can a successor company be held liable for the unlawful employment practices of its predecessor? and 2) When a successor company has notice of an EEOC charge naming its corporate predecessor, is it necessary for the discriminatee to refile the charge and additionally name the successor company?
 
 
 11
 The Supreme Court has considered the obligations of a successor company under the Labor Act, supra. In John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 548, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964), the Supreme Court held:
 
 
 12
 'The disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not authomatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances . . . the successor employer may be required to arbitrate with the union under the agreement.'
 
 
 13
 Substantial continuity of identity in the business enterprise before and after the change was set forth as the key factor in the determination. Id. at 551, 84 S.Ct. 909.
 
 
 14
 The holding rested on considerations of national labor policy:
 
 
 15
 'Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.' Id. at 549, 84 S.Ct. at 914.
 
 
 16
 In National Labor Relations Board v. Burns International Security Services, Inc., 406 U.S. 272, 281-291, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Supreme Court recognized that the decision in Wiley, supra, was not without its limitations. The Court held that while successor employers may be bound to bargain with an incumbent union, they would not be bound by the substantive provisions of a collective bargaining agreement negotiated by their predecessors but not agreed to or assumed by them. This holding was based on the importance attached to private bargaining without official compulsion over the actual terms of the contract. The Court also observed that requiring a new employer to be bound by the substantive terms of a pre-existing collective bargaining agreement might inhibit the free transfer of capital and restrict him from making substantial changes in the business. Id. at 287-288, 92 S.Ct. 1571.
 
 
 17
 In Golden State Bottling Co., Inc. v. N.L.R.B., 414 U.S. 168, 171-174, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), the Supreme Court, after noting that the successor company acquired the predecessor with notice of unfair labor practice litigation and continued the business without substantial interruption or change in operations, employee or supervisory personnel, upheld the N.L.R.B.'s order requiring the successor to reinstate with back-pay an employee discharged by the predecessor company. Both companies were held jointly and severally liable for the back-pay award.
 
 
 18
 Quoting with approval from Perma Vinyl Corp., 164 N.L.R.B. 968, 969 (1967), enforced sub nom. United States Pipe & Foundry Co. v. N.L.R.B., 398 F.2d 544 (5th Cir. 1968), the Court stated:
 
 
 19
 'To further the public interest involved in effectuating the policies of the Act and achieve the 'objectives of national labor policy, reflected in established principles of federal law,' we are persuaded that one who acquires and operates a business of an employer found guilty of unfair labor practices in basically unchanged form under circumstances which charge him with notice of unfair labor practice charges against his predecessor should be held responsible for remedying his predecessor's unlawful conduct.
 
 
 20
 'In imposing this responsibility upon a bona fide purchaser, we are not unmindful of the fact that he was not a party to the unfair labor practices and continues to operate the business without any connection with his predecessor. However, in balancing the equities involved there are other significant factors which must be taken into account. Thus, 'It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace.' When a new employer is substituted in the employing industry there has been no real change in the employing industry insofar as the victims of past unfair labor practices are concerned, or the need for remedying those unfair labor practices. Appropriate steps must still be taken if the effects of the unfair labor practices are to be erased and all employees reassured of their statutory rights. And it is the successor who has taken over control of the business who is generally in the best position to remedy such unfair labor practices most effectively. The imposition of this responsibility upon even the bona fide purchaser does not work an unfair hardship upon him. When he substituted himself in place of the perpetrator of the unfair labor practices, he became the beneficiary of the unremedied unfair labor practices. Also, his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.' 414 U.S. at 171-172, n. 2, 94 S.Ct. at 418-419, n. 2.
 
 
 21
 We are of the view that the considerations set forth by the Supreme Court in these three cases as justifying a successor doctrine to remedy unfair labor practices are applicable equally to remedy unfair employment practices in violation of Title VII. Each case, however, must be determined on its own facts. What is required is a balancing of the purposes of Title VII with the legitimate and often conflicting interests of the employer and the discriminatee. At stated by the Supreme Court in Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees and Bartenders International Union, AFL-CIO, 417 U.S. 249, n. 9, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974):
 
 
 22
 'But the real question in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative. The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.'
 
 
 23
 Title VII was molded, to a large degree, after the Labor Act, supra. International Brotherhood of Electrical Workers, Local Union No. 5 v. EEOC, 398 F.2d 248 (3d Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 628, 21 L.Ed.2d 565 (1969). Indeed, the relief provisions of Title VII were derived from an analogous provision in the Labor Act, 29 U.S.C. 160(c). United States v. Georgia Power Co., 474 F.2d 906, 921, n. 19 (5th Cir. 1973).
 
 
 24
 Title VII's ban against unfair employment practices is not mutually exclusive with the Labor Act's prohibition of unfair labor practices. The two may be used as tools to remedy the same conduct. A practice permitted under the Labor Act might be prohibited by Title VII. Tipler v. E.I. duPont deNemours and Co., 443 F.2d 125, 129 (6th Cir. 1971). Nevertheless, the emphasis that both Acts place on extending protection to and providing relief for the victims of prohibited practices is sufficient, in our view, to warrant imposing liability on a corporate successor for Title VII violations of the predecessor company.
 
 
 25
 We emphasize that the liability of a successor is not automatic, but must be determined on a case by case basis.
 
 
 26
 We hold only that Title VII per se does not prohibit the application of the successor doctrine, but rather mandates its application. Title VII was designed to eliminate discrimination in employment and the courts were given broad equitable powers to eradicate the present and future effects of past discrimination. See, e.g., Head v. Timken Roller Bearing Co., 486 F.2d 870, 876 (6th Cir. 1973); United States v. Local 169, Carpenters, 457 F.2d 210, 216 (7th Cir. 1972).
 
 
 27
 The Senate-House Conference Report for the relief section of the 1972 Amendments to Title VII states:
 
 
 28
 'The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.' Section-by-Section Analysis, Congressional Record (H.1863), March 8, 1972.
 
 
 29
 Failure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with an incomplete remedy. In the case where the predecessor company no longer had any assets, monetary relief would be precluded. Such a result could encourage evasion in the guise of corporate transfers of ownership. Similarly, where relief involved seniority, reinstatement or hiring, only a successor could provide it.
 
 
 30
 It is to be emphasized that the equities of the matter favor successor liability because it is the successor who has benefited from the discriminatory employment practices of its predecessor.
 
 
 31
 The nature and extent of liability is subject to no formula, but must be determined upon the facts and circumstances of each case. The primary concern, however, is to provide the discriminatee with full relief. Such relief may be awarded against the successor. On the other hand, the amenability of the predecessor to suit and its ability to provide relief will be a necessary inquiry.
 
 
 32
 Focusing on the second part of the issue, 2000e-5 of Title 42 provides in pertinent part as follows:
 
 
 33
 '(b) Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer . . . has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge . . . on such employer . . . within ten days, and shall make an investigation thereof . . .. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action . . .. If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. ' (f) (1) If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d), the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge . . ..'
 
 
 34
 It is well settled that this section makes the filing of a charge with the EEOC a condition precedent to suit. Thornton v. East Texas Motor Freight, 497 F.2d 416 (6th Cir. 1974); LeBeau v. Libbey-Owens-Ford Co., 484 F.2d 798, 799 (7th Cir. 1973); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719 (7th Cir. 1969). The charging requirement has two purposes.
 
 
 35
 'First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law.' 416 F.2d at 719.
 
 
 36
 We are of the view that this requirement must be read in conjunction with the statute of limitations set forth in 42 U.S.C. 2000e-5(e) which provides as follows:
 
 
 37
 'A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.'
 
 
 38
 If the charging requirement is read in light of the statute of limitations, it is reasonable to assume, at least in the case of successor companies, that Congress only intended that a discriminatee be required to name those who were known to him and could have been charged within the period of limitations.
 
 
 39
 This interpretation is logical and wholly consistent with the purposes of Title VII. The statutory mandate of informal settlement and conciliation is not served by requiring an aggrieved person to charge each new successor company. Such a requirement might encourage evasion through corporate transfers. Even in the case of bona fide transfers of ownership, the delays which would be involved in refiling charges might be substantial and result in prejudice to the discriminatee. Furthermore, serious questions would be presented as to whether a charge filed against a successor would be barred by the statute of limitations.
 
 
 40
 The importance that Title VII attaches to the avoidance of delay is evident from the language of the statute. Section 2000e-5(e), supra, places a relatively short statute of limitations on the time for filing a charge. Also, 2000e-5(f)(4) requires the chief judge of the district in which the civil action is pending to designate immediately a judge to hear the case. The designated judge has the responsibility to set the case for 'hearing at the earliest practicable date and to cause the case to be in every way expedited.' 42 U.S.C. 2000e-5(f)(5).
 
 
 41
 Since MacMillan had notice of the charge against Flintkote and had custody and control of all related documents, requiring 'a second 'filing' by the aggrieved party . . . would serve no purpose other than the creation of an additional procedural technicality. Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.' Love v. Pullman Co., 404 U.S. 522, 526-527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972).
 
 II.
 
 42
 The District Court, although recognizing that successorship liability could be imposed in certain cases, granted summary judgment against the EEOC because, in its view, the EEOC had not come forward with any evidence to support a successorship theory.
 
 
 43
 The party moving for summary judgment has the burden of establishing the absence of any genuine issue of material fact. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). This is so even when the party opposing the motion submits no evidentiary matter in opposition to the motion. 398 U.S. at 159-161, 90 S.Ct. 1598.
 
 
 44
 In Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962), this court, speaking through Judge Weick, stated the guidelines governing the disposition of motions for summary judgment:
 
 
 45
 'In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. 6 Moore's Federal Practice Par. 56.15(3), pp. 2123-2126.
 
 
 46
 'It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute * * *.' 6 Moore's Federal Practice Par. 56.11(1), p. 2057. See also: Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).'
 
 
 47
 Although summary judgment is a useful tool in many cases, it must, nevertheless, be used sparingly. In S. J. Groves & Sons Co. v. Ohio Turnpike Commission, 315 F.2d 235, 237 (6th Cir.), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963), we stated:
 
 
 48
 'This Court has on several occasions expressed the view that a trial judge should be slow in disposing of a case of any complexity on a motion for summary judgment, that while such a judgment wisely used is a praiseworthy and timesaving device, yet such prompt dispatch of judicial business is neither the sole nor the primary purpose for which courts have been established, and that a party should not be deprived of an adequate opportunity to fully develop his case by witnesses and a trial, when the issues involved make such procedure the appropriate one.'
 
 
 49
 Courts that have considered the successorship question in a labor context have found a multiplicity of factors to be relevant. These include: 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product. Howard Johnson Co., Inc., supra, 417 U.S. at 256-258, 94 S.Ct. 2236; Golden State Bottling Co., Inc., supra, 414 U.S. at 170-171, 184, 94 S.Ct. 414; Burns, supra, 406 U.S. at 274, 280-281, 92 S.Ct. 1571; Wiley, supra, 376 U.S. at 551, 84 S.Ct. 909; N.L.R.B. v. Interstate 65 Corp., 453 F.2d 269, 272-274 (6th Cir. 1971); N.L.R.B. v. Zayre Corp., 424 F.2d 1159, 1162 (5th Cir. 1970); Overnite Transportation v. N.L.R.B., 372 F.2d 765, 768 (4th Cir.), cert. denied, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967).
 
 
 50
 The case at bar was dismissed before MacMillan filed an answer or responded to the EEOC's interrogatories. Although the record is insufficient to show substantial continuity of identity in the business enterprise before and after MacMillan took control of the Cleveland facility, we are of the view that MacMillan's affidavit in support of the motion created a genuine issue of material fact as to its successor status.
 
 
 51
 The affidavit established that MacMillan operated its facility at the same address as Flintkote and that MacMillan had notice of the EEOC proceedings and custody and control of all charges and related documents which had been filed against Flintkote for its Cleveland facility. Moreover, since MacMillan and Flintkote were manufacturers of containers and Flintkote manufactured containers at its Cleveland facility, a genuine question arises as to whether MacMillan continued Flintkote's container operation.
 
 
 52
 Rather than grant MacMillan's motion for summary judgment, the District Court should have granted MacMillan's motion under Rule 12(a), Fed.R.Civ.P., to require the EEOC to set forth a more definite statement of its allegations in paragraphs eight and nine, supra, of the complaint. These allegations specify that MacMillan had been named in a charge filed with the EEOC and that all conditions precedent to suit had been fulfilled. Since the record conclusively establishes that MacMillan was not named in a charge, MacMillan is entitled to a more definite statement of these allegations.
 
 III.
 
 53
 The Union was joined as a party defendant under Rule 19(a),[1] Fed.R.Civ.P., 'because the decree entered by the court may affect, in some way, its collective bargaining agreement' with MacMillan. The Union is not charged with a Title VII violation and no relief is sought against it.
 
 
 54
 The District Court, sua sponte, entered summary judgment in favor of the Union because its posture in the suit was derivative to MacMillan's. Since we have held that it was error for the District Court to grant MacMillan's motion for summary judgment, it follows a fortiori that the reason given by the District Court for granting summary judgment in favor of the Union is insufficient.
 
 
 55
 The Union seeks to justify the District Court's judgment and argues that is should be dismissed from this action because it was not named in any charge filed with the EEOC. We are of the view that this contention has no merit.
 
 
 56
 As stated in Part I of this opinion, the purpose of the charging requirement is to give notice to the party and bring it before the EEOC so as to effect an informal resolution of the charge. Were the EEOC seeking relief from the Union for an alleged Title VII violation, this case would be in an entirely different posture. However, where as here, the Union is not alleged to have violated Title VII, we are unable to agree with the Union that a failure to charge it precludes it from participating in the suit.
 
 
 57
 In many cases, requiring a discriminatee to name a nonviolating union in a charge would serve no purpose. For instance, where an employer denies all Title VII liability and refuses to resolve a charge, it would be a needless exercise to require the Union to be a party to the EEOC proceedings.
 
 
 58
 Moreover, as is often the case, the discriminatee is ignorant of the law and is probably unaware that a neutral collective bargaining agreement may have perpetuated an employer's discriminatory practices. It is possible that the discriminatee would realize his mistake after the statute of limitations had run and, thus, be barred from naming the union as a party.
 
 
 59
 We believe that the EEOC followed the proper course when it joined the Union under Rule 19(a), Fed.R.Civ.P. This provides the Union with a full opportunity to participate in the litigation and the formulation of proposed relief against MacMillan. As a practical matter, the Union need not play a role in the litigation until the court finds that MacMillan has violated Title VII. Such an opportunity will allow the Union to protect adequately the interests of its members, will provide the discriminatee with full and complete relief and will also insure that the suit is handled at one time and in one forum. This procedure is fully consistent with Title VII's emphasis on judicial expediency. See 42 U.S.C. 2000e-5(f)(4) and (5).
 
 
 60
 Moreover, the Rule 19(a) vehicle is also consistent with Title VII's grant of broad equitable powers to the courts to eradicate the present and future effects of past discrimination. Aside from Rule 19(a)'s consistency with Title VII, we have found nothing in the Civil Rights Act that would indicate that Congress intended to supplant the Rule in suits under the Act. Whether the Union should be joined is, of course, a matter for the District Court in the first instance. We only hold that Title VII per se does not bar the joinder of the Union. See Reyes v. Missouri-Kansas-Texas Railroad Co., 53 F.R.D. 293, 297 (D. Kansas 1971); Torockio v. Chamberlain Mfg. Co., 51 F.R.D. 517, 519 (W.D.Penn.1970); Bremer v. St. Louis Southwestern Railroad Co., 310 F.Supp. 1333, 1340 (E.D.Mo.1969). See also Bing v. Roadway Express, Inc., 485 F.2d 441, 445 (5th Cir. 1973) (Union joined as party defendant to participate in remedy.)
 
 
 61
 The Union contends that such a result is inequitable because it has been put through the expense of hiring an attorney and doing involuntary discovery work for EEOC. We do not find this argument to be persuasive. Had the Union been named in a charge filed with the EEOC, it is reasonable to assume that the services of an attorney would have been required. Also, a subsequent civil action would have put the Union in no different position than in the case at bar. Moreover, the court, in its discretion, may allow attorney's fees to be recovered against the EEOC. 42 U.S.C. 2000e-5(k). Such authorization is designed to insure that the EEOC does not commence groundless actions.
 
 
 62
 With respect to involuntary discovery, it is clear that, whether the Union was named in a charge filed with the EEOC, it was subject to investigation relating to the unlawful employment practices of MacMillan. Section 2000e-8(a) of Title 42 states that the EEOC shall 'have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices . . . and is relevant to the charge under investigation.' Section 2000e-9 provides that 29 U.S.C. 161 governs the conduct of all hearings and investigations conducted by the EEOC. This section has long been interpreted as giving the N.L.R.B. the authority to compel the production of evidence by a union when it was not named in a charge. N.L.R.B. v. Lewis, 310 F.2d 364 (7th Cir. 1962). Aside from the statutory analogy, the broad investigatory powers of the EEOC have been judicially recognized. See e.g., Motorola, Inc. v. McLain, 484 F.2d 1339, 1342-1345 (7th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 287 (1974).
 
 
 63
 Even if the Union were not a party to this action, it would still be subject to the discovery provisions of the Federal Rules of Civil Procedure. We are of the view that the Union's objections to involuntary discovery can be adequately treated with a Protective Order under Rule 26(c), Fed.R.Civ.P.
 
 
 64
 This case is reversed and remanded for proceedings not inconsistent with this opinion.
 
 
 65
 No costs are taxed. Each party will bear its own costs in this appeal.
 
 
 
 *
 Honorable Frank Gray, Jr., Chief Judge, United States District Court, for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 '(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.'