**Frances WHEELER, Plaintiff-Appellee,**

v.

**SNYDER BUICK, INC., Defendant-Appellant.**

**Frances WHEELER, Plaintiff-Appellant,**

v.

**DOUBLE K, INC., Defendant-Appellee.**

Nos. 84–2499, 84–2512.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1985.

Decided July 3, 1986.

Danney E. Glass, Fine Hatfield Sparren-berg & Fine, Evansville, Ind., for plaintiff.

Frank R. Hahn, Cedric Hustace, Bowers Harrison Kent & Miller, Evansville, Ind., for defendants.

Before ESCHBACH, Senior Circuit Judge, FLAUM, Circuit Judge, and DOYLE, Senior District Judge.*

JAMES E. DOYLE, Senior District Judge.

Frances Wheeler brought this action alleging defendant Snyder Buick, Inc. (Snyder) discharged her on account of her sex, thereby violating Title VII, 42 U.S.C. § 2000e *et seq.* A bench trial in the district court resulted in a judgment against Snyder, but the court absolved from liability Double K, Inc., the corporate successor to Snyder. On this appeal, Snyder disputes the determination of liability under Title VII and also the court's calculation of back-pay awarded to Wheeler. Wheeler appeals from the court's holding that Double K is not liable to Wheeler for the unlawful actions of Snyder.

### Facts

In its written opinion, the district court found the facts as follows:

Wheeler became a new car salesperson at Snyder in June, 1977, where she remained until discharged on January 13, 1979. During her tenure, Wheeler was the only female salesperson at Snyder; previously, two other females had been salespersons briefly.

Wheeler was a capable salesperson. Her sales of new cars earned her several awards, including "Salesman of the Year" in 1978. However, Wheeler was not an ideal employee. Her aggressiveness led her colleagues to suspect she took their sales prospects at times, and Wheeler appeared to resent the requirement that management had to approve all car deals.

Her habits of not keeping her demonstrator car clean and of smoking while waiting on customers also annoyed her employer. As a result, there was friction between Wheeler and some of her colleagues, including Timothy Lutz, leading to an "antagonistic atmosphere" on the sales staff.

Wheeler's actions were not wholly responsible for the antagonistic environment. Lutz, the supervisor who fired Wheeler, "barely concealed his resentment about Wheeler's presence on the sales staff;" he possessed an "animus toward women in the new car business." Shortly before his promotion from salesperson to sales manager, Lutz stated to Jon Boasso, a former Snyder employee, that upon becoming sales manager his first task was to get rid of the " 'dirty slut working as a car salesman.' " Lutz made other negative statements such as "there was 'no damn room in the new car business for a woman' and that car sales was 'a man's field.' " Four witnesses testified Lutz had made anti-female remarks in their presence, and Lutz, who testified, never denied making any of them.[1]

Former employee Boasso, whose duties at Snyder included appraising customers' trade-in automobiles, was instructed by Jack Hughes, another Snyder employee, to lower appraisals of Wheeler's customers' potential trade-ins by $250 to $400.

In the summer of 1978, the Snyder sales staff began to suspect someone was leaking customer information to a competitor, Hendrickson and Sons; in particular, there had been significant losses of sales to Hendrickson salesperson Jack Tucker, a former Snyder employee and a friend of Wheeler. In one instance "Tucker did receive customer information from Wheeler," but otherwise Tucker did not obtain the names of prospective customers from Wheeler.

In January 1979, Michael Tooke, a Snyder salesperson and brother-in-law of Lutz, devised a scheme to catch Wheeler passing

---

* The Honorable James E. Doyle, Senior District Judge for the Western District of Wisconsin, is sitting by designation.

1. We construe this as a finding by the district court that Lutz did make the statements.

information to a competitor. Tooke filled out a phone customer information card listing the name and phone number of a friend of Tooke's, Mark Calvin. Calvin was not in the market for a new car. Tooke placed the card on the showroom desk and asked Wheeler to watch the desk temporarily. Calvin received a phone call that evening from someone identifying himself as Jack Tucker, but there was no evidence Tucker made such a call.[2] Tooke informed Lutz of the "Tucker" call to Calvin, and the next day Lutz fired Wheeler after accusing her of passing Calvin's name to Tucker. Wheeler denied the allegation, and Snyder never investigated Lutz's accusation.

Following her discharge from Snyder, Wheeler was hospitalized briefly, and then experienced a personal tragedy, the death of her son. Had she had a job to return to, Wheeler's period of grief would have been reduced. Wheeler kept her resume updated, and she applied for jobs both in person and by responding to advertisements. She did not seek employment in other new car establishments in Evansville; she had a fear of being blackballed. The fear was legitimate. There were few female new car salespersons in Evansville. Wheeler worked some as a substitute teacher and in the insurance business, which she left in December, 1981. Her insurance jobs "never netted her a living wage," and thus did not constitute employment comparable to her car sales position. Had Wheeler remained with Snyder, based on her seniority she would have been laid off from July 23, 1980 to March 4, 1981.

On May 2, 1983, Snyder Buick sold all or nearly all of its assets to Double K, Inc. The transaction included no purchase of stock. Double K proceeded to employ many of the persons who had been employed by Snyder, and Double K continued to engage in the business of selling automobiles. Double K represented an entirely different ownership; the previous owners

had no control over the business entity after the sale of assets. At the time of trial, Snyder remained a viable corporate entity with a net value of approximately $196,000. At the time of the transaction, Double K had no notice or knowledge of Wheeler's claim against Snyder.

### District Court Decision

In holding that Snyder had discriminated against Wheeler on account of her sex, the district court followed the analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court decided Wheeler had established a prima facie case of discriminatory discharge by showing "that she belongs to a protected class, that she was qualified for the job in question, and performing as normally required, that she was discharged, and that she was replaced by a nonprotected class member." The court decided that Snyder had articulated legitimate business reasons for the discharge, namely, Wheeler's passing of customer information to a competitor—or Snyder's good faith belief she had done so—and the personality conflict between Wheeler and her co-workers and supervisor. The court then proceeded to reject these articulated nondiscriminatory reasons as pretexts for discrimination. First, no evidence at trial established Tucker made the alleged incriminating phone call to Calvin; in discharging Wheeler, Snyder relied on a suspect report. Second, although "Wheeler was not a perfect employee ... any personality conflict which arguably developed was created by the overt hostility and scurrilous behavior manifested by Lutz."

The district court refused to impose liability on Double K. The lack of notice to Double K prevented the imposition of successor liability under the test established in *Equal Employment Opportunity Com-*

---

**2.** We understand the district court to mean that: Calvin had no basis for knowing whether the person who identified himself as Jack Tucker was Jack Tucker, and at trial Snyder offered no evidence to prove, and failed to prove, it was

Jack Tucker who made the call. (Called in rebuttal by Wheeler, Tucker testified he had no recollection of ever talking with a person named Mark Calvin.)

*mission v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir.1974) (applying successorship liability doctrine to Title VII context). Moreover, the facts fit none of the exceptions to the general common law rule that an asset purchase for cash does not impose liability on the successor corporation for liabilities of the seller corporation. *Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir.1977). According to the district court, the exception arguably closest—continuity of the business enterprise—is inapplicable because while many Snyder employees remained and became employees of Double K, the ownership and overall control of the two corporations were entirely distinct.

The district court's refusal to hold Double K liable necessarily limited the remedies available to Wheeler: first, reinstatement was unavailable; and second, May 2, 1983, the date of the purchase, marked the end of Wheeler's backpay award.

The court awarded backpay to Wheeler covering the entire period between her termination, January 13, 1979, and May 2, 1983, the date of the purchase of assets, except for the one week in January 1979 when she was hospitalized and the period in which Wheeler would have been laid off (July 23, 1980 to March 4, 1981). The court calculated the amount of backpay to which Wheeler was entitled by inferring that had she remained at Snyder during that period, she would have continued to receive the proportion of total Snyder sales commissions she earned in 1978—28.8%. Wheeler also received pension and health insurance payments. The total damages awarded, excluding attorney fees and costs, were $49,405.04.

### Title VII Violation

Snyder challenges, on a number of grounds, the district court's conclusion that Wheeler's termination was intentionally discriminatory. Since "a finding of intentional discrimination is a finding of fact,"

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1981), under Fed.R.Civ.P. 52(a) we may not overturn it unless clearly erroneous. Moreover, the conclusory finding of discrimination is itself based on findings of fact, generally involving credibility determinations made by the court. Under Rule 52 these credibility-based factual determinations require "even greater deference" than do findings not based on credibility: "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 4317 (citations omitted). Snyder directly challenges three factual findings of the district court involving witness credibility, thus triggering the onerous burden for reversal just described.

(1) Snyder first contends the court's finding that Boasso was instructed to lower artificially his appraisals of Wheeler trade-ins is clearly erroneous. The sole testimony establishing this claim was that of Boasso. According to Snyder, Boasso's testimony was incredible in light of certain documentary evidence casting doubt on Wheeler's claim she was forced to "shop"[3] a great deal of her potential trade-ins. Sales records placed in evidence by Snyder showed several salespersons shopped a greater percentage of their trade-ins than did Wheeler. The records also showed Snyder made no exceptionally high profits on Wheeler's trade-ins, which would have been the case had Snyder intentionally underappraised Wheeler's customers' cars. However, the district court found this evidence insufficient to rebut the testimony of Boasso because the documents failed to show how many sales were lost by Wheeler as a result of low appraisals of Wheeler's trade-ins. The court found credible the direct testimony of Boasso regarding his

---

**3.** "Shopping" a car occurs when a salesperson, unhappy with what he or she considers a low appraisal of a customer's trade-in vehicle by the salesperson's establishment, contacts other car dealers in an attempt to secure a higher price for the vehicle.

instructions to underappraise Wheeler's customers' proposed trade-ins. We cannot say the finding was clearly erroneous.

(2) Snyder argues the court erred in finding Wheeler did not furnish sales leads to Tucker. Tucker testified that in one instance Wheeler had told him a couple who previously had bought cars from Tucker visited Snyder. Tucker contacted the couple and ultimately sold them a car at Hendrickson's. Snyder urges that this testimony proves Wheeler provided sales leads to Tucker. The district court acknowledged the one instance in which Tucker received "customer information" from Wheeler, but found there was no arrangement between Wheeler and Tucker to enable Tucker to steal Snyder customers. The district court concluded that Snyder had failed to establish the key point in the alleged customer espionage scheme, the alleged telephone call to Calvin from Tucker, following Tooke's phony customer card ploy. It is significant that Wheeler's discharge came on the heels of Tooke's scheme; there was no evidence Snyder had any knowledge of the one earlier incident in which Wheeler passed on information to Tucker. The court concluded the alleged passing of sales leads by Wheeler was a pretextual ground for dismissal. This conclusion is not clearly erroneous.

(3) The third credibility-based finding challenged by Snyder concerns Boasso's testimony that Lutz told Boasso Lutz's "first line of duty upon becoming sales manager was to rid the sales staff of the 'dirty slut working as a car salesman.'" According to Snyder, this testimony was incredible because at the time the statement allegedly was made, Lutz had not yet been named sales manager. In light of Lutz's promotion to the position of sales manager soon after the date Lutz allegedly made the statement, it was reasonable for the district court to find "Lutz likely anticipated becoming sales manager."

In spite of the direct evidence of discriminatory animus, Snyder maintains the following constituted legitimate grounds for Wheeler's discharge:[4] (1) a mistaken but genuine belief that Wheeler was leaking customer information; and (2) a personality conflict between Wheeler and her supervisor. The district court's findings dispose of these arguments. Courts have held employers not liable under Title VII when they have discharged employees based on a good faith, albeit mistaken, belief a legitimate cause for discharge existed. *See Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1357 (W.D.Pa.1977). Here, however, the district court found a discriminatory animus lay behind Wheeler's discharge, not a good faith belief of misconduct by Wheeler.

■ It is also true, as Snyder points out, that a personality conflict between an employer and employee can provide legitimate grounds for discharge. *Barnes v. Callaghan*, 559 F.2d 1102 (7th Cir.1979). Again,

---

**4.** Snyder raises separately the argument that liability is precluded under the principle established in *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mt. Healthy* a teacher claimed he was discharged for exercising his right of expression under the first amendment; the school board contended it had independent legitimate grounds for discharging the plaintiff. In remanding the case, the Court held the school board would not be liable if it could prove that in the absence of the impermissible factor, namely the plaintiff's exercise of protected speech, it would have fired the plaintiff anyway. *Id.* at 287, 97 S.Ct. at 576.

The *Mt. Healthy* rule has been applied as a separate, additional step in the *McDonnell-Douglas* scheme. *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir.1983). However, we think the requirement that the impermissible factor, here sexual discrimination, must have been a sufficiently large component of the challenged decision is already embodied in the third step of the *McDonnell-Douglas* test, namely, need for plaintiff to show defendant's asserted justifications were pretextual. Plaintiff must prove "that the reasons advanced were a pretext and that a motivating or substantial factor in the defendant's decision was discrimination and but for the discrimination" the defendant would not have taken the adverse action. *Sherkow v. State of Wis.*, 630 F.2d 498 (7th Cir.1980). Although not precisely expressed in *Mt. Healthy* terms, the finding of the district court in the present case was clearly that but for the sexual discrimination, Wheeler would not have been discharged.

**1234**

however, the court below found that any personality conflict between Wheeler and Lutz derived from Lutz's "overt hostility and scurrilous behavior," and the "anti-female attitude existing at Snyder." The court's finding of discriminatory animus precludes an inference that a no more than personality conflict existed. We find no error in the district court's implicit finding that no legitimate alternative grounds for Wheeler's discharge existed.[5] Hence we conclude the district court properly held Snyder's discharge of Wheeler was discriminatory, in violation of Title VII.

### Damages

The district court wields considerable discretion in calculating damages, and its decision is not reversible unless clearly erroneous. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Once damages have been established, it is the employer's burden "to prove, as an affirmative defense, that the employee failed to mitigate those damages." *Hanna v. American Motors Corp.,* 724 F.2d 1300, 1307 (7th Cir.1984). To prevail, the employer must prove both that the employee was not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance the employee might have found comparable employment. *Id.,* (citing *Syvock v. Milwaukee Boiler Mfg. Co.,* 665 F.2d 149, 159 (7th Cir.1981)).

### 1. Diligence in seeking other employment.

Snyder emphasizes Wheeler's failure to pursue employment with other new car dealers in Evansville. Snyder also claims between Wheeler's discharge in January 1979, and December of that year, when she accepted employment with an insurance agency, Wheeler did not make sufficient efforts to find other types of employment. The district court found she kept her resume updated and applied for jobs in person and by answering advertisements. As for Wheeler's failure to pursue employment in the new car field, the district court excused Wheeler's conduct based on the court's finding that Lutz had threatened to blackball her in the car business, and also on the fact that there were few women in the car sales business in Evansville.

Snyder further contends that Wheeler's entitlement to backpay ended with her voluntary resignation from her second insurance agency job in December 1981. According to Snyder, the position of insurance agent is comparable to that of new car salesperson; in both the employee's income is derived largely from sales commissions; in quitting comparable employment, admittedly for personal reasons, Wheeler ceased her mitigation of damages. The district court found Wheeler's insurance agency positions were not comparable to her car sales position, primarily because being an insurance agent "never netted her a living wage." Hence the court held her resignation from the insurance agency did not end her mitigation efforts.

A diligent Title VII plaintiff endeavoring to mitigate damages would at least check the want ads, register with employment agencies, and discuss job opportunities with friends and acquaintances. *Sprogis v. United Air Lines, Inc.,* 517 F.2d 387, 392 (7th Cir.1975). Snyder did not show Wheeler failed to take any of these steps; on the contrary, Wheeler testified she did answer want ads, register with employment agencies, and apply for various positions. Snyder made no showing that comparable employment was available. Although we are not untroubled by the level of Wheeler's post-termination job-seeking activities, we may not overturn the district court's determination that Wheeler exercised reasonable diligence in seeking other employment.

We agree with the district court that the duty to mitigate damages does not

5. Snyder also argues the district court erred in imposing a duty on Snyder to investigate the firing of Wheeler. Although the district court opinion does refer to the fact that Snyder never conducted an investigation, we do not read the court's decision as in any way resting on that ground.

preclude a plaintiff from quitting a position in a different business that pays substantially less money. *See Hanna v. American Motors Corp.*, 724 F.2d 1300, 1309 (7th Cir.1984). Title VII claimants are not obliged to "go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982).

### 2. *Inability to work.*

Snyder argues grief made Wheeler incapable of working from the date of her son's death, January 27, 1979, until May 1979. Wheeler testified she would have been prepared to return to work by May or April of 1979. She testified by deposition that at a March 23 meeting between her union representative and Mr. Snyder about her grievance, she did not seek reinstatement. Wheeler's explanation was that she was "in deep grief at that time" and unable to work. Wheeler also testified, however, she would have gotten over her grief sooner had she remained at Snyder and had there been no sexual discrimination in the workplace. Based on this statement the district court refused to speculate on when Wheeler might have been able to return to work and thus refused to deduct any amount from her backpay award.

■ Although Wheeler's testimony is certainly susceptible to more than one interpretation, particularly since she twice stated she could have returned to work in May, we perceive no clear error in the district court's finding on this question. It was not clearly erroneous to infer Wheeler would have been unable to face the discriminatory atmosphere of her job setting until May, but, given nondiscriminatory treatment at Snyder, would have been able to return earlier.

### 3. *Layoff period.*

The court accepted Wheeler's argument that under the collective bargaining agreement in force at Snyder, layoffs of sales-

persons were governed strictly by seniority. The agreement made no distinction between salespersons of new as opposed to used cars, and although "Wheeler's qualifications to sell used cars were suspect ... given Wheeler's considerable success, a reasonable business decision would have been to move a new car salesperson to the used car staff to make room for Wheeler." Assuming a layoff based strictly on seniority, the court concluded Wheeler would have been out of work from July 23, 1980 to March 4, 1981—the date of the departure of an employee with more seniority than Wheeler and the return date of the first employee with less seniority than Wheeler. The court tolled the award of backpay during this interval.

■ Snyder contends Wheeler would have been laid off from April 2, 1980 to May 20, 1981.[6] Snyder argues it is unreasonable to suppose used car personnel with less seniority than Wheeler would have been laid off before Wheeler since, by her own admission, Wheeler did not know how to appraise used cars. April 2 is the date on which all new car salespersons with less seniority than Wheeler were laid off, and no new car salespersons were recalled or hired until May 1981. According to Snyder, Wheeler would have been laid off during this longer period. We see no clear error in the district court's finding that in light of Wheeler's sales prowess a reasonable business decision would have been to retain Wheeler and shift another new car salesperson to used car sales.

### *Successor Liability*

Wheeler contends the application of the successor liability doctrine renders Double K liable for the discriminatory act of Snyder.

In *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir.1985), we addressed extensively the application of the successor liability doctrine in the context of employment discrimination. We held the successor liabili-

---

**6.** The acceptance of this layoff period would be significant, since under the collective bargaining agreement an employee laid off more than one year lost all seniority.

ty doctrine applies in employment discrimination cases, including those brought under 42 U.S.C. § 1981. The court analogized from cases holding successor employers liable in suits brought under the National Labor Relations Act. *Id.* at 745–46. *See Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). From that line of precedent, we distilled three justifications for successor liability that apply with equal force in the context of employment discrimination: (1) the overriding congressional policy against unfair employment practices; (2) the helplessness of the victim to protect his rights when ownership of the business changes; and (3) the ability of the successor to provide relief at a minimum cost. *Musikiwamba, supra* at 746. Title VII "was explicitly patterned after the NLRA." *Id.* at 748.

■ Because in *Musikiwamba* we confronted only a claim under § 1981, we did not directly address the applicability of the successor liability doctrine in a Title VII case. The decision was premised, however, on the proposition that successor liability applies in the Title VII context. *Id.* We so hold.

We continue to find helpful criteria articulated in *Equal Employment Opportunity Commission v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086 (6th Cir. 1974): (1) whether the successor employer had prior notice of the claim against the predecessor; (2) whether the predecessor is able, or was able prior to the purchase, to provide the relief requested; and (3) whether there has been a sufficient continuity in the business operations of the predecessor and successor.[7]

The first two factors are "critical" because of the inequity of holding a successor liable when "the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." *Musikiwamba,* 760 F.2d at 750.

The remaining factor, the degree of continuity between the two enterprises, can be viewed as a variant of the "continuity" exception to the general common law rule that "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities." *Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir.1977).[8]

In the present case: (1) No challenge is made to the district court finding that at the time it purchased Snyder assets, Double K had no knowledge whatever of Wheeler's claim against Snyder. (2) Snyder is able to provide the monetary relief granted by the district court; backpay from the time of the discharge to the time of the sale of assets to Double K. Perhaps it is able to pay backpay from the time of the sale of assets to the time of trial, if such relief were appropriate. But, because it lacks control of the business, it is unable to reinstate Wheeler in her job. (3) There is a very considerable continuity, following the sale of assets, with the major exception

---

7. The third factor represents an amalgamation of a number of indicia of continuity set forth in *MacMillan:* (1) "whether the new employer uses the same plant;" (2) "whether he uses the same or substantially the same work force;" (3) "whether he uses the same or substantially the same supervisory personnel;" (4) "whether the same jobs exist under substantially the same working conditions;" (5) "whether he uses the same machinery, equipment, and methods of production;" and (6) "whether he produces the same product." *MacMillan, supra* at 1094.

8. There are four standard exceptions to the general rule of nonliability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a "mere continuation" of the seller; and (4) where the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. *Travis v. Harris Corp.,* 565 F.2d at 446 (citations omitted).

that the identity of the ownership is totally different.

Snyder was in the best position to prevent the present dilemma; it could have been forthcoming with Double K in the course of the negotiations for the sale of the assets. Double K was in the next best position; it could have made timely inquiry of Snyder and even independently of Snyder.[9] Wheeler (and other employees of Snyder) were in the least advantageous position; earlier through their union, they could have sought certain protections in the event of a sale. It may well be, although we refrain of course from deciding the point, that if Double K were required to provide relief to Wheeler, such as reinstatement in the job or backpay from the time of its purchase of the assets until the time of trial, it could require indemnification by Snyder for the backpay and for whatever injury might actually arise from reinstatement of Wheeler.

It seems probable that the present case is not atypical: the difficulties it poses in the search for equity are likely to be encountered frequently, with variations, in the wake of sales of substantial assets. This court is committed to the view that the general common law rule of nonliability on the part of successors is too harsh to employees for application in the context of discrimination in employment, and that the traditional common law exceptions to the nonliability rule insufficiently ease the harshness. But in both the common law and the *MacMillan* approach, there looms large, understandably, the question whether the purchaser of the assets enjoyed timely actual knowledge of the claim and a potential liability. We are not prepared to hold that absence of timely actual knowledge is a bar to successor liability in every case. We are surely not prepared to hold it is never a bar. The question is whether a judicial doctrine should be created, focusing perhaps on the diligence or lack of diligence of a successor in making inquiry prior to purchase, or perhaps on the development of indemnification rights in the successor as against the predecessor entity.

As we have noted earlier in this opinion, in *Musikiwamba* this court strongly embraced the view that, as in the context of Congressional regulation of labor relations, so in the context of Congressional prohibition of discrimination in employment, judicial importation of the concept of successor liability is essential to avoid undercutting Congressional purpose by parsimony in provision of effective remedies. As we have noted also, vindication of the Congressional purpose to diminish substantially, if not to eliminate, discrimination in employment justified not only importation of the common law concept of successor liability, but liberalization of that concept in favor of victims of discrimination in employment. However, in the present case, in which the absence of any timely actual knowledge on the part of the successor is so clear, in which substantial, while not complete, relief from the predecessor is available to the victim, and in which the ownership of the predecessor and of the successor is totally distinct, we refrain from subjecting the doctrine of successor liability to judicial surgery on the scale which would be necessary to permit Wheeler to obtain relief from Double K. More generally, the national dimensions of the dilemma we have described in this opinion are likely to be explored more adequately and responded to more effectively by Congress than by the courts.

The judgment of the district court is affirmed in all respects.

---

**9.** The district court made no findings on the matter of diligence or lack of diligence on the part of Double K. The record suggests there was little, if any.