
Loretta COLEMAN, Plaintiff,

v.

KEEBLER COMPANY and O'Boisie
Corporation, Defendants.

No. 1:96–CV–407.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Feb. 5, 1998.

Denise K LaRue, Neil Andrew Davis, Haskin Lauter Cohen & LaRue, Indianapolis, IN, for Plaintiff.

John W Bowers, Stacey L Katz, James P Posey, Beers Mallers Backs and Salin, Fort Wayne, IN, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] on the motion for summary judgment filed by Defendant O'Boisie Corporation ("O'Boisie"), on December 1, 1997.

On January 5, 1998, the Plaintiff, Loretta Coleman ("Plaintiff"), filed her brief in opposition and on January 20, 1998, O'Boisie filed its reply.

The record before the Court consists of the deposition excerpts of the Plaintiff; deposition excerpts of Thomas Gates, Human Resource Manager at the Bluffton Snack Food Plant; the affidavit of Cathy Smith ("Smith aff. ____"); the affidavit of Viola Martinez ("Martinez aff. ____"); the affidavit of Thomas Gates ("Gates aff. ____"); the affidavit of Donald Schumacher ("Schumacher aff. ____"); and various documentary exhibits.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended by 42 U.S.C. § 1981(a) ("ADA"), and more particularly 42 U.S.C. § 12117. For the following reasons, O'Boisie's motion will be GRANTED.[2]

### II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are viewed in a light most favorable to the Plaintiff, the non-moving party.

On August 24, 1987, the Plaintiff submitted an employment application to Keebler at its Bluffton plant. On that application, the Plaintiff falsely stated that she had completed the twelfth grade of high school. (*See* Pl. dep. at 245.) The Plaintiff was nevertheless hired, and began her employment on January 15, 1988. While employed with Keebler, she worked as a converter, and as a packer. (*Id.* at 53, 63–64.)

In June of 1994, the Plaintiff took a medical leave of absence due to non-work related problems concerning "locked elbows" and arthritis. (*Id.* at 42–43, 152.)

On February 5, 1995, and while still out on medical leave, the Plaintiff bid on the position of fry packer and was awarded the position. The Plaintiff expected that she would be placed in that position when she was able to return to work, and Thomas Gates, Keebler's Human resources Director for the Bluffton facility, was aware of the Plaintiff's expectation. (Gates dep. at 144; Pl. dep. 104.) Later, in April of 1995, the Plaintiff had surgery on both elbows. (*Id.* at 49.) This surgery apparently ended the Plaintiff's ability to perform her old job of converter. (*Id.* at 58–59.) Nevertheless, the Plaintiff remained out on medical leave until July 6, 1995, and Gates approved all requested extensions for leave up to that date on the assumption that her disability continued. (Gates dep. at 68–9.)

On July 6, 1995, the Plaintiff was released to return to work subject to certain work restrictions; a ten pound weight limitation for both the left and the right arm, and no repetitive pushing, pulling or twisting for the left and the right arm. (*See* Keebler exh. B.) Gates knew that the Plaintiff's physician had indicated that these work restrictions were "permanent." (Gates dep. at 93–4; Gates aff. ¶ 15.)

At about that same time, the Plaintiff presented her medical release to Keebler's personnel coordinator, Connie Inskeep, who told her that she could not return to work as there was nothing in the plant that the Plaintiff could do. (*See* Pl. dep. at 73–5.) The Plaintiff was not afforded the opportunity to speak to Gates and, despite her request, no

---

**1.** Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

**2.** The summary judgment motion of co-Defendant Keebler Company remains pending and by an order entered contemporaneously herewith, is set for oral argument.

copy of the fry packer job description was provided to her or her doctor. (*Id.* at 75–77, 299.)

Gates admits that the Plaintiff was not placed in the fry packer position because of her medical restrictions. (Gates dep. at 86, 136 .) The Plaintiff had the "seniority" to be placed in the position, which means that she "had the ability" to do the work. (*Id.* at 138.)

Shortly after this, during July of 1995, the Plaintiff contacted her union and requested that they file a grievance. (Pl. dep. at 78.) However, the grievance was denied on July 15, 1995, and the union failed to pursue the grievance through the final step of arbitration. (Gates aff. ¶ 27 & Exh. O.) Gates contends that during the grievance, he spoke with the Plaintiff's union representative many times but that neither the Plaintiff nor her union representatives suggested any position that the Plaintiff could fill, other than the fry packer position, nor was any accommodation suggested that would allow the Plaintiff to perform the fry packer job. (*Id.* ¶ 28–30.)

The Plaintiff filed a charge of discrimination with the Indiana Civil Rights Commission ("EEOC charge") on September 20, 1995. (O'Boisie's Supp.App. 2.) That charge alleges that the Plaintiff was discriminated against due to her disability by Inskeep and Gates because they told her that no position was available in the plant that would accommodate her restrictions. (*Id.* ) Keebler Senior Attorney Thomas F. Mahoney responded to the EEOC regarding Coleman's charge by letter dated October 17, 1995. (O'Boisie Supp.App. 3.)

On November 1, 1995, Keebler officially closed the Bluffton plant's operations and laid off all hourly employees due to an impending sale of the plant to Kelly Food Products, Inc. ("Kelly"). (Schumacher aff. ¶¶ 3–5.) However, some employees were kept on the payroll to run tests to assure potential buyers that the plant could still produce snack food efficiently. (Gates Dep. at 23–4.) This scaled-down operation continued until the plant reopened under new ownership. (*Id.* at 24–5.)

Donald Schumacher was the majority shareholder of Kelly, and was the main individual negotiating on behalf of Kelly to purchase the assets of the Bluffton plant. (*Id.* ¶¶ 2, 11.) In preparation for the sale Schumacher investigated the financial status of Keebler and the Bluffton plant, but Keebler never disclosed to him information about any pending discrimination claims or lawsuits. (*Id.* ¶ 3, 7.) At no time did Keebler inform Schumacher or anyone else representing Kelly of Coleman's pending EEOC charge. (*Id.* ¶ 11.)

The sale for the assets and inventory of the Bluffton plant from Keebler to Kelly was completed on November 18, 1995. (*Id.* ¶ 6.) Under the express terms of the sales contract, Kelly assumed only those liabilities of Keebler that were necessary to operate the Bluffton plant, i.e., liabilities that were related to the plant's assets and inventory. (*Id.* ¶ 8.) Keebler agreed as part of the contract to indemnify Kelly, or its assignee, for any liabilities that Kelly did not expressly assume. (*Id.* ¶ 9.) On January 26, 1996, Kelly assigned its rights under the contract with Keebler to O'Boisie, which took over operations of the Bluffton plant. (*Id.* ¶ 10.) [3] O'Boisie reopened the Bluffton plant on February 1, 1996. (*Id.* ¶ 11.)

When O'Boisie reopened the plant, it agreed to accept the collective bargaining agreement that had governed the relationship between Keebler and the employee union of which Coleman was a member, Retail Worker's Department Store Union, AFL—CIO Local 835 (the "union") (Gates Dep. at 24–5.) That collective bargaining agreement remained in place between the union and O'Boisie until December 31, 1997. (*Id.* at 27.) In effect, O'Boisie filled its employment needs at the Bluffton plant using those employees who had previously been laid off by Keebler in strict accordance with the union's seniority system and the collective bargaining agreement. (*Id.* at 24–5.) The re-hired union employees were not required to fill out new employment applications. (*Id.* at 25.) Coleman was on medical leave status at this

---

**3.** Schumacher was also the majority shareholder of O'Boisie. Schumacher aff. ¶ 1.

time, but was apparently rehired by O'Boisie.[4]

Nevertheless, the Plaintiff remained on medical leave from O'Boisie. During this time she performed clerical work for her husband's construction business from July of 1995 to June of 1996, and until she began employment at the Pit Stop Deli. At the Deli the Plaintiff worked forty hours per week as a cashier, made pizzas, did sweeping, mopping, made sandwiches and bussed tables. (*See* Pl. dep. 16–7.)

On December 2, 1996, O'Boisie notified Plaintiff by letter that she was being terminated pursuant to the collective bargaining agreement in effect with the union. (*Id.* at 135.) More particularly, the Plaintiff's period of medical leave had surpassed two years, and under the collective bargaining agreement this triggered the loss of the Plaintiff's seniority and termination of her employment relationship with the company. (*See* Gates Dep. at 135–36; Keebler's Mot. for Sum. Jud. Exh. C ¶ 7.7 (Collective Bargaining Agreement); *Id.* Exh. D (termination letter)).

O'Boisie in its motion for summary judgment argues that the Plaintiff cannot establish that it is liable as a successor corporation to Keebler. O'Boisie also contends that the Plaintiff was never a qualified individual with a disability who, with or without reasonable accommodation, could perform the essential functions of the packer's job, and, at the very least, that it is entitled to summary judgment with regard to the Plaintiff's claims for reinstatement and an award of front pay because she lied on her employment application about her educational qualifications.

The Plaintiff contends that O'Boisie independently refused to place the Plaintiff in the fry packer position, and that Gates, who obviously knew of her situation and EEOC charge while employed at Keebler, was hired as Human Resources Director by O'Boisie and continued to refuse to reinstate the Plaintiff to any position after January 1996. In fact, the Plaintiff contends that Gates, as O'Boisie's agent, discharged the Plaintiff because of her disability.

---

4. The record before the Court is devoid of any details surrounding Coleman's termination by Keebler or her rehiring by O'Boisie.

## III. SUMMARY JUDGMENT PRINCIPLES

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 106 S.Ct. at 2512; *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.,* 89 F.3d 452, 455 (7th Cir.1996); *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir. 1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the

motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson,* 477 U.S. at 249–51, 106 S.Ct. at 2511; *North Am. Van Lines, Inc.,* 89 F.3d at 455. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586,

106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

## IV. DISCUSSION

O'Boisie argues that it is cannot be liable to the Plaintiff because she has not alleged direct liability on the part of O'Boisie, and because O'Boisie is not a successor employer as a matter of law. The Plaintiff frames the issue differently and argues that O'Boisie is a proper defendant because O'Boisie discriminated against her independently of Keebler, and is a proper defendant despite the fact that O'Boisie was not named in her EEOC charge. Under either analysis it is clear that we must grant O'Boisie's motion for summary judgment as to the issue of liability.

### A. O'Boisie is not a Successor Employer

In the Plaintiff's second amended complaint[5] she expressly makes a claim against O'Boisie based one allegation, that O'Boisie was a successor employer (to Keebler) of the Plaintiff. O'Boisie now seeks summary judgment on that claim. The doctrine of successor liability was extensively analyzed by the Seventh Circuit in *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740 (7th Cir.1985) (42 U.S.C. § 1981 discrimination case), and then again in *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228 (7th Cir.1986) (Title VII case).[6] The Court must examine

---

5. For the sake of brevity, we shall hereinafter refer to the Plaintiff's "second amended complaint" merely as the "complaint." *See Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84, et al.,* 133 F.3d 1054, 1056 (7th Cir.1998) ("Once an amended pleading is filed, it supersedes the prior pleading. The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading, and becomes functus officio.") (citations and footnote omitted).

6. The Court notes that O'Boisie assumes, without discussion, that the successor employer doctrine applies to this ADA case. The Court's research has disclosed only one Court that has expressly decided whether a successor may be liable for its predecessor's violations of the ADA. *See McKee v. American Transfer and Storage,* 946 F.Supp. 485, 487 (N.D.Tex.1996) (approving the successor liability doctrine in ADA claims). The powers and remedies of the ADA are the same as those available under Title VII, *id.* (citing 42 U.S.C.

three factors in determining whether a successor will be held liable for the discriminatory conduct of the predecessor: 1) whether the successor had notice of the claim against the predecessor prior to the purchase; 2) whether the predecessor is able, or was able prior to the purchase, to provide the relief sought; and 3) whether there is continuity in the operation of the business before and after the purchase. *Musikiwamba*, 760 F.2d at 750–751; *Wheeler*, 794 F.2d at 1236; *see also E.E.O.C. v. Vucitech*, 842 F.2d 936, 945 (7th Cir.1988).

The first two factors are "critical," because it would be "grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief." *Musikiwamba*, 760 F.2d at 750; *Wheeler*, 794 F.2d at 1236 (citing *Musikiwamba*). Similarly, a successor who exercises due diligence in its purchase and yet fails upon inquiry to uncover evidence of the plaintiff's lawsuit prior to the purchase will not be found to have notice. *Wheeler*, 794 F.2d at 1237; *Musikiwamba*, 760 F.2d at 752.[7] As to the third factor, "enough continuity between the predecessor and the successor must exist so that it can be fairly inferred that the successor and predecessor reasonably expected that the successor would be bound." *Musikiwamba*, 760 F.2d at 751. Successor liability is an equitable doctrine rather than "an inflexible command," Chicago *Truck Drivers Union v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir.1995), and "emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256, 94 S.Ct. 2236, 2240, 41 L.Ed.2d 46 (1974) (NLRA case).

There is no evidence in the record from which we could infer that O'Boisie had any knowledge of the Plaintiff's EEOC charge (which had been filed on September 20, 1995), prior to the purchase of the Bluffton plant from Keebler on November 18, 1995. Schumacher, O'Boisie's majority shareholder and main negotiator with Keebler, stated in his affidavit that he researched the Bluffton plant purchase with due diligence, and that no one from Keebler ever told him about the lawsuit. Schumacher further stated that he did not learn of this lawsuit until December 1996, after O'Boisie was added as a defendant. While these statements are somewhat conclusory in nature, they are uncontradicted and represent the only evidence in the record as to what Schumacher, and therefore O'Boisie, knew prior to the sale of the Bluffton facility.

The Plaintiff's only response is that Gates, who was aware of the Plaintiff's EEOC charge while a Keebler employee, must have known of the charge when he became an O'Boisie employee, giving O'Boisie constructive knowledge of a potential lawsuit by the Plaintiff.[8] However, the Plaintiff presented no evidence to demonstrate that Gates ever had any communications with Schumacher, much less communications about the EEOC charge, prior to the sale. Presumably Gates was not involved in any way in the purchase negotiations between Keebler and Schumacher, and therefore Gates' knowledge of the claim cannot be impugned to O'Boisie during the critical pre-sale time period.

The second factor of the successor employer analysis also weighs in favor of O'Boisie. It is uncontradicted that Keebler's assets in 1996 totaled over $1 billion, with a sales base of over $2 billion. Moreover, Keebler received $8 million for the sale of the Bluffton

§ 12117), and the Seventh Circuit has approved the successor employer doctrine in Title VII cases. *Wheeler*, 794 F.2d at 1236. Thus, this Court assumes, as an issue of first impression in this Circuit, that the successor employer doctrine is applicable to ADA cases.

**7.** Arguably, the "due diligence" standard articulated in *Wheeler* and *Musikiwamba* is merely dicta, but later cases have understood due diligence as a dispositive consideration in determining notice. *See, e.g., Goldberg v. Rainbow Path,*

*Inc.*, 1997 WL 688881, at *4 (N.D.Ill. Oct.24, 1997) (citing *Musikiwamba*); *Ninth Ave. Remedial Group v. Allis–Chalmers Corp.*, 195 B.R. 716, 726 n. 2 (N.D.Ind.1996) (same). *Cf. Vucitech,* 842 F.2d at 945 (successor group "knew or should have known" that charges of sex discrimination had not been resolved).

**8.** The Plaintiff advance this notice argument in the context of her "adequate notice exception" argument discussed *infra*, but the Court addresses it here for purposes of completing the record.

plant. Clearly Keebler can afford to satisfy any judgment the Plaintiff may secure in this case.[9]

Finally, the continuity factor weighs in favor of O'Boisie. Although the Bluffton plant began operations under O'Boisie with many of the same employees and supervisors who had been employed by Keebler, the ownership of the plant was, of course, completely different. This factual scenario is very similar to that of *Wheeler*, where the court found that although considerable continuity existed between the business of the successor and predecessor, the totally distinct ownership of the two was a "major exception" to the continuity requirement. *Id.* 794 F.2d at 1236–37. The totally distinct ownership between the two Defendants here prevents the Plaintiff from establishing the necessary continuity between Keebler and O'Boisie.

In sum, O'Boisie prevails on all three factors of the successor employer test, (the theory of liability advanced in the Plaintiff's complaint), and must be dismissed from this case. We find the conclusion of *Wheeler* appropriate to this case:

> [I]n the present case, in which the absence of any timely actual knowledge on the part of the successor is so clear, in which substantial, while not complete, relief from the predecessor was available to the victim, and in which ownership of the predecessor and of the successor is totally distinct, we refrain from subjecting the doctrine of successor liability to judicial surgery on the scale which would be necessary to permit [the Plaintiff] to obtain relief from [O'Boisie].

*Id.* 794 F.2d at 1237.

### B. O'Boisie is Not Directly Liable

█ In response to O'Boisie's motion the Plaintiff asserts that she is not suing O'Boisie as a successor corporation, but as an independent wrongdoer under the ADA. *See* Pl. Resp. Br. at 9. The Plaintiff recognizes that she did not name O'Boisie in her EEOC charge, usually a fatal flaw, *see, e.g., Schnell-*

baecher v. Baskin Clothing Co., 887 F.2d 124, 126 (7th Cir.1989) (a party not named in an EEOC charge may not be sued for discrimination), but argues that this case comes under the "adequate notice" exception to the general rule as outlined in *Eggleston v. Chicago Journeymen Plumber's Local Union No. 130,* 657 F.2d 890 (7th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). However, the Plaintiff's attempt to invoke the *Eggleston* adequate notice exception is factually untenable.

The theory behind the adequate notice exception is well established:

> [The] adequate notice exception arises where "an unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance." The purpose of this exception is to prevent frustration of the goals of anti-discrimination suits by not requiring procedural exactness in stating the charges. Complainants frequently file EEOC charges without the assistance of counsel and are not well versed either in the technicalities of pleading or the jurisdictional elements of the [statute]. Complainants are also not expected to file EEOC charges which "specifically articulate in precise terms, a narrow legal wrong which they have suffered, rather EEOC charges are typically detailed in lay person's terms." Additionally, Congress did not intend that a person filing EEOC charges should accurately ascertain, at the risk of later facing dismissal, at the time the charges were made, every separate and distinct entity which may have committed the unlawful discrimination. Given the [statute's] remedial purposes, courts construe EEOC charges with "utmost liberality," and parties sufficiently named or alluded to in the factual statement of the EEOC charge are to be joined.

---

9. It is not essential that the Plaintiff obtain equitable relief (i.e.reinstatement) in order to be fully compensated, making the argument that Keebler cannot provide the Plaintiff with reinstatement of

no moment. *See* Pl. Second Amend. Compl. ¶ 19(i) (Seeking "reinstatement to her previous position *or* an award of front pay.") (emphasis added).

*Kopec v. City of Elmhurst,* 966 F.Supp. 640, 646 (1997) (quoting *Eggleston*) (internal citations omitted).

The Plaintiff argues that her claim against O'Boisie falls within the adequate notice exception because she filed her EEOC charge *pro se,* and did not ascertain at the time that she needed to name O'Boisie in the charge. The Plaintiff supports this assertion with her deposition statement "I assumed that O'Boisie and Keebler [were] together." *See* Coleman Dep. at 249, 251. However, this statement, and consequently the Plaintiff's argument, rings hollow in light of the factual circumstances. The Plaintiff filed her EEOC charge on September 20, 1995, alleging acts of discrimination that occurred on July 6, 1995. O'Boisie was not even in the picture then; it did not become owner of the Bluffton plant until November 18, 1995, and it did not begin operations there until February 1, 1996. Obviously, the allegations contained in the Plaintiff's EEOC charge cannot possibly implicate O'Boisie, because they occurred several months prior to O'Boisie's ownership of the plant. It is literally impossible for the Plaintiff's EEOC charge to reasonably allude to any conduct attributable to O'Boisie, and therefore the Plaintiff's attempt to invoke *Eggleston* is without merit.

■ The Plaintiff's adequate notice argument also fails because it seeks to hold O'Boisie directly liable for the alleged activity recounted in the EEOC charge, a theory the Plaintiff first advanced in her response brief. However, in contradistinction, the plain language of the Plaintiff's complaint clearly seeks to invoke only successor liability, not direct liability, upon O'Boisie:

O'Boisie purchased the manufacturing plant from Keebler subsequent to Coleman's constructive discharge. O'Boisie is a successor employer for purposes of the [ADA].

Pl. Second Amend. Compl. ¶ 3. Indeed, the complaint alleges that the Plaintiff was constructively discharged on July 6, 1995, several months prior to O'Boisie's ownership of the plant, and explicitly states that "Keebler terminated Coleman's employment on July 6, 1995 because of her physical impairments." *Id.* ¶¶ 2, 10.

The Plaintiff's failure to include a theory of O'Boisie's direct liability in her complaint, or to plead any facts that would infer the direct liability of O'Boisie, prevents her from asserting any direct liability in response to O'Boisie's summary judgment motion. That is, the Plaintiff has "fallen victim to the well-settled rule that a party is bound by what it states in its pleadings," *Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997). "Although the rule smacks of legalism, judicial efficiency demands that a party not be allowed to controvert what it has already told a court by the most formal and considered means possible." *Id.* Put another way, "Allegations in a complaint are binding admissions, and admissions can of course admit the admitter to the exit from the federal courthouse." *Jackson v. Marion County,* 66 F.3d 151, 153–54 (7th Cir.1995). Moreover, it is well-settled that the Plaintiff cannot amend her complaint with a later filed brief in opposition to a summary judgment motion. *See, e.g., Auston v. Schubnell,* 116 F.3d 251, 255 (7th Cir.1997); *Harrell v. United States,* 13 F.3d 232, 236 (7th Cir.1993); *cf. Dawson v. General Motors Corp.,* 977 F.2d 369, 372–73 (7th Cir.1992) ("Of course, a plaintiff may not argue on appeal that a contract consisted of Y when the complaint alleged that the contract consisted of X.") Consequently, the Plaintiff's complaint, which only advances a successor liability theory against O'Boisie, prohibits her from now arguing that O'Boisie is directly liable to her for some violation of the ADA.

In sum, neither the EEOC charge or Plaintiff's complaint establishes a theory of direct liability against O'Boisie, nor can the Plaintiff establish that O'Boisie is a successor to Keebler, the only party named in the EEOC charge. Of course, even if the Plaintiff could make out an ADA claim against O'Boisie while she was in its employ (e.g., possible failure to accommodate and termination), she never filed an EEOC charge encompassing any conduct by O'Boisie between its purchase of the Bluffton facility and her termination on December 2, 1996,

and consequently any such claim is time-barred. *Schnellbaecher*, 887 F.2d at 126.

## V. CONCLUSION

For the foregoing reasons, O'Boisie's motion for summary judgment is GRANTED. Consequently, there is no need to reach the merits of O'Boisie's motion to strike the affidavits of Cathy H. Smith and Viola Martinez, and O'Boisie's motion to strike is deemed MOOT.